UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRUCE M. COOPER, JOHN W.            )
ROMITO, ROY L. BAKER, and           )
WHITNEY TAYLOR THOMPSON,            )
        Plaintiffs                  )
                                    )
              v.                    )   C.A. No. 12-cv-10530-MAP
                                    )
CHARTER COMMUNICATIONS, INC.        )
and CHARTER COMMUNICATIONS          )
ENTERTAINMENT I, LLC,               )
        Defendants                  )


MEMORANDUM AND ORDER RE: MOTION TO DISMISS
(Dkt. No. 8)

May 21, 2013


PONSOR, U.S.D.J.

I. INTRODUCTION

Plaintiffs have filed this class action lawsuit against two cable companies, seeking to recover damages for rebates not credited automatically following cable, Internet, and phone service outages caused by an unusually heavy snowstorm in October of 2011.  Defendants have moved to dismiss the complaint.  For the reasons discussed below, the motion will be allowed.

II. FACTS

In weighing a motion to dismiss, the court must take the allegations in the complaint as true and draw all reasonable inferences in the plaintiffs' favor.  Curran v. Cousins, 509 F.3d 36, 43 (1st Cir. 2007).  Beyond the complaint, facts may be considered that are contained in "documents the authenticity of which are not disputed by the parties," including official records, documents central to plaintiffs' claim, or documents sufficiently referred to in the complaint.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000).  On the issue of subject matter jurisdiction, facts put forward by the defendants may also be taken into consideration to the extent that they are not challenged by the plaintiffs.  Bluetarp Fin., Inc. v. Matrix Const. Co., Inc., 709 F.3d 72, 79 (1st Cir. 2013).  Here, both sides have submitted factual material that the court will take into account in deciding the motion to dismiss.[1]

---

[1] The court has examined the exhibits attached to Plaintiffs' Second Amended Complaint, such as the Cable Television License Renewal Agreement between Defendants and the Town of East Longmeadow and the chapter 93A Demand Letter, (Pls.' Second Am. Compl., Dkt. No. 36, Ex. 1 & 3), and the bulletin of the Massachusetts Office of Consumer Affairs and

A.   <u>Factual Background</u>.

Defendants Charter Communications, Inc., and Charter
Communications Entertainment I, LLC, provide cable
television, Internet, and telephone services to business and
residential customers in Massachusetts.  Before they began
providing cable television services, Defendants entered into
license agreements with the towns in which their consumers
resided.  The license agreements between the towns and
Defendants set forth the terms and conditions under which
Defendants constructed, upgraded, operated, and maintained
the cable television systems in the towns.  In large part,
the license agreements tracked the requirements of Mass.
Gen. Laws ch. 166A, §§ 1- 20, & 2.[2]  One of the terms that
had to be included in the licensing agreements described a
"pro rata credit or rebate" in the event of a service

Business Regulations ("OCABR"), (Dkt. No. 36, Ex. 2.).  For
purposes of evaluating the jurisdictional question, the court
has considered the facts submitted in the Second Affidavit of
Thomas P. Cohan, (Defs.' Supplemental Mem. in Supp. of
Charter's Mot. to Dismiss, Dkt. No. 41, Ex. 1), to the extent
that they are uncontradicted.  <u>Bluetarp Fin., Inc.</u>, 709 F.3d
at 79.

[2] Cable licensing agreements are also governed by federal
law, the Cable Communications Policy Act of 1984, 47 U.S.C. §
521.  However, only state law is relevant in this matter.

interruption of twenty-four hours or more.  Ch. 166A, §
5(1).

Defendants distributed their cable television signal
throughout the Commonwealth out of a so-called "headend"
facility in Oxford, Massachusetts.  From the headend
facility, the signal traveled over a network of six hubs
using fiber optic cable; those six hubs distributed the
signal to 972 fiber optic nodes, which in turn distributed
the signals to homes and businesses within Defendants'
service area.  Each node served about 500 customer
locations.

Once a customer signed a contract for services with
Defendants,[3] the cable television signal reached the
customer via a service drop line, which ran into the home or
business.  The system used for cable television service also
carried Internet and telephone service to customers who
opted for those additional services.

Plaintiffs do not dispute that, generally, when a

---

[3] The agreement between a customer and Defendants required
prepayment of cable television services; the bill a customer
paid was for services that would be delivered the following
month.

customer loses service due to lack of power or a fallen
service drop line, "[Defendants do] not possess the
automated means to track when a customer loses and recovers
service access, or measure the intervening time period."[4]
(Second Aff. Thomas P. Cohan, Dkt. No. 41, Ex. 1 at 3 ¶ 9.)

On October 29, 2011, an unusually early, very heavy
snowstorm hit western Massachusetts, dumping several inches
of wet snow and causing extensive tree damage and downed
power and cable lines.  Many thousands of homes and
businesses lost power, cable television, Internet, and phone
service, some for several weeks.[5]  A portion of Defendants'
customers lost power and cable service; others lost only
power, but were unable to access their cable service because
of their lack of electricity.  The damage and outages caused
by the snowstorm were the topic of extensive reports by the

_____

[4] If called about an Internet or telephone service
interruption, Defendants had the means to determine at that
particular point in time whether the signal was getting
through to that particular customer.  However, Defendants aver
(and Plaintiffs do not dispute) that, without notice from the
customer, they did not have the means to determine
connectivity generally and, in particular, the scope and
duration of lost service at a particular location due to power
outages. (Aff. Cohan, Dkt. No. 41, Ex. 1 at 3-4 ¶¶ 10-13.)

[5] Plaintiffs have defined the relevant time period as
being between October 29 and December 31, 2011.

local and regional news media.

It appears undisputed that Defendants' statewide cable system, from the headend facility through the hubs and nodes, remained up and running without interruption through the use of backup generators throughout the storm and its aftermath.  (Id. at 2 ¶ 4.)  Nevertheless, many of Defendants' customers lost access to their cable, Internet, and/or phone services because their service drop lines were downed by fallen tree limbs.  Others maintained their access to Defendants' services but were unable to use them because of a lack of power, also due to fallen tree limbs.

Around this time, the Massachusetts Office of Consumer Affairs and Business Regulations ("OCABR") released a notice entitled "Cable TV Consumer Bulletin: Severe Storms."  (Dkt. No. 36, Ex. 2.)  In addition to warning consumers not to touch fallen wires, the bulletin informed consumers that they did not have to notify their cable company if they were without service when a severe storm was widely publicized and the cable company had deployed extra crews to restore service (which, in the case of the October 2011 storm, Defendants had).  The bulletin also advised consumers of

their rights to a pro rata credit or rebate for any service interruption lasting twenty-four hours or more, including interruptions that only affected one tier of service.[6]

Defendants' policy for applying a credit for interrupted service required customers to call Defendants and notify them of the lost service and its duration.[7]  This policy was included in the customer contracts signed at the initial provision of service, as well as in the yearly customer notifications and the monthly billing statements. (Aff. Cohan, Dkt. No. 41, Ex. 1 at 4-7 ¶¶ 14-23.)

On December 9, 2011, Plaintiffs Bruce M. Cooper, John W. Romito, and Roy L. Baker served on Defendants a chapter 93A demand letter, pursuant to the Massachusetts Consumer

---

[6] According to the Federal Communications Commission's Guide titled "Consumer Options for Selected Cable Channels and the Tier Buy-Through Prohibition," a "tier of service" is the package of channels available to subscribers.  Cable companies are required to offer a basic service tier, which includes the local broadcast stations and whatever public, educational, and governmental channels are required pursuant to their licensing agreements. After a customer has purchased the basic service tier, he can purchase other tiers of service from the provider. FCC, ""Consumer Options for Selected Cable Channels and the Tier Buy-Through Prohibition," June 3, 2011, http://www.fcc.gov/guides/consumer-options-selecting-cable-channels-and-tier-buy-through-prohibition.

[7] In the event of a twenty-four hour system-wide outage, Charter would automatically credit customer's accounts, but the October 2011 outage was not system-wide.

Protection Act, notifying Defendants of their demand for a
credit or rebate for the service interruption caused by the
snowstorm.  (Dkt. No. 36, Ex. 3.)  Upon receiving the demand
letter, Defendants adjusted the accounts of the three named
Plaintiffs to credit them for the service outages they
experienced.[8]  On September 27, 2012, Plaintiffs filed a
Second Amended Complaint, adding Whitney Taylor Thompson as
a fourth named Plaintiff.  Her account with Defendants has
not been, as of yet, credited for the service interruption
experienced after the storm.

B.   Procedural Course.

     On February 21, 2012, Plaintiffs filed suit in state
court, individually and on behalf of all other persons
similarly situated, against Defendants for failing to credit
customers automatically for the service outages suffered
after the snowstorm -- that is, to credit them rebates

---

     [8] Subsequent to the receipt of the chapter 93A Demand
Letter, Defendants adjusted Plaintiff Baker's account by
$45.43 and Plaintiff Romito's account by $66.10 for the
outages that occurred between October 29 and November 7, 2011.
Prior to the lawsuit, Plaintiff Cooper had independently
contacted Defendants about a credit for the outage, and his
account was credited $37.65 on November 6, 2011, and then
credited a further $8.88 after Defendants' receipt of the
chapter 93A demand letter. (Aff. Greg A. Garabedian, Dkt. No.
9, Ex. 1 at 2 ¶¶ 7-8.)

without the necessity of any request.

After removing the case to this court, Defendants filed a motion to dismiss based on lack of case or controversy and on failure to state a claim.  Following oral argument on September 26, 2012, the court permitted supplemental briefing and the filing of a second amended complaint, adding Whitney Taylor Thompson as a named plaintiff.  The amended complaint formally articulated theories first offered by Plaintiffs in their opposition to Defendant's motion to dismiss.  (Pls.' Second Am. Compl., Dkt. No. 36.) Because the parties have adequately briefed the issues, further oral argument is not necessary.

### III. DISCUSSION

Where a defendant files a motion to dismiss both for lack of subject matter jurisdiction as well as for failure to state a claim, the First Circuit has counseled that the issue of subject matter jurisdiction be tackled first. Deniz v. Municipality of Guaynabu, 285 F.3d 142, 149-50 (1st Cir. 2002).  That will be the approach here.

A.   Subject Matter Jurisdiction.

A federal court has the constitutional authority to

hear a case that presents "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." North Carolina v. Rice, 404 U.S. 244, 246 (1971) (internal quotations and citations omitted). Federal courts are not "empowered to decide moot questions or abstract propositions." Id. Even when a live controversy exists at the time of filing, subsequent developments may render the case moot. Barr v. Galvin, 626 F.3d 99, 104 (1st Cir. 2010). A case may also be moot where the court cannot provide meaningful or effectual relief to the aggrieved party. Am. Civil Liberties Union of Mass. v. U.S. Conf. of Catholic Bishops, 705 F.3d 44, 52-3 (1st Cir. 2013) (hereinafter ACLU). "The burden of establishing mootness rests with the party invoking the doctrine," here Defendants. Id. at 52.

A plaintiff may escape dismissal for mootness where the case presents issues that -- though moot -- are "capable of repetition, yet evading review." Barr, 626 F.3d at 105. To employ this escape hatch prior to class certification, the

plaintiff must demonstrate a probability that "the same controversy, involving the same parties, will reoccur." Cruz v. Farquharson, 252 F.3d 530, 534 (1st Cir. 2001). Moreover, the First Circuit has described this exception as applying only in extraordinary circumstances involving a challenged action that was too short in duration to permit a trial court enough time to address the issue.  ACLU, 705 F.3d at 57.

A second limited exception to the mootness doctrine arises where a defendant manufactures mootness "by satisfying the named plaintiff's claim, effectively avoiding judicial resolution of a matter by 'picking off' the named plaintiffs." Wilson v. Sec'y of Health & Human Svcs., 671 F.2d 673, 679 (1st Cir. 1982).  This exception recognizes that the policy objectives of class actions would be frustrated if a defendant could forestall class-action proceedings by buying off or tendering judgment on individual claims.  See Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper, 445 U.S. 326, 339 (1980).

Here, Plaintiffs argue that the court should exercise jurisdiction over this controversy despite the credits to

three of the four named Plaintiffs' accounts.  Plaintiffs
assert that they have not been sufficiently compensated.
Additionally, Plaintiffs argue that both exceptions to the
mootness doctrine apply:  Defendants are "picking off"
possible plaintiffs, and the injury to Plaintiffs is
"capable of repetition."

These arguments are unpersuasive as to the first three
named Plaintiffs, Cooper, Romito, and Baker.  Defendants
have made these Plaintiffs whole by crediting their accounts
for the entire duration of the service outages they suffered
due to the October storm.  Their claims are therefore moot.

Plaintiffs' argument that they have not been
sufficiently compensated because their complaint seeks
double or treble damages and reasonable attorneys' fees
cannot rescue them from dismissal.  Chapter 93A does not
permit courts to award more than single damages if a
defendant has tendered a reasonable settlement offer with
its answer to the demand letter.  Mass. Gen. Laws ch. 93A, §
11; RGJ Assocs., Inc. v. Stainsafe, Inc., 338 F. Supp. 2d
215, 239 (D. Mass. 2004).  In determining whether
Defendants' tender of settlement is sufficient or

-12-

reasonable, attorney's fees "do not form a part of the equation," and losses that are not foreseeable consequences of chapter 93A misconduct -- such as double or treble damages -- are also not included.  RGJ Assocs., Inc., 338 F. Supp. 2d at 239.  Thus, because the court cannot provide any other meaningful relief, the claims of these three Plaintiffs have been mooted.  See ACLU, 705 F.3d at 52-3.

Moreover, neither of the two recognized exceptions to the mootness doctrine applies here.  This is not a case where the issues are "capable of repetition, yet evading review," because the challenged action cannot be characterized as being so short in duration that the court would not have the opportunity to address the issue if it arose again.  ACLU, 705 F.3d at 57 (stating that the capable-of-repetition doctrine applies only to "exceptional situations," such as "inherently transitory" claims like pregnancies or elections).  Neither is this a case where Defendants can be said to be "picking off" Plaintiffs in an attempt to avoid adjudication of the merits.  Defendants' policy of crediting customers for service outages greater than twenty-four hours was in place before the suit was

-13-

filed, and the credit was equal to the value of the services lost.  The straightforward application of a pre-existing policy to provide a credit cannot constitute "picking off."

Prior to the filing of the Second Amended Complaint, the above analysis would have justified prompt entry of judgment for Defendants.  However, the fourth, recently-added named Plaintiff Thompson has not had her account credited, apparently because she has declined to reveal the duration of her loss of services.  For this reason, the court must proceed, as to her, to the second basis for dismissal, failure to state a claim.[9]

B.   <u>Failure to State a Claim</u>.

Plaintiffs' claims are anchored on the contention that Defendants were obligated to credit automatically customers' accounts, without a request, after a service outage greater than twenty-four hours.  Plaintiffs' five-count complaint alleges contract, quasi-contract, and statutory bases for finding Defendants liable.  Defendants contend that none of

---

[9] The logic of the discussion regarding failure to state a claim would apply, of course, to the three prior Plaintiffs if their claims were not clearly dismissable based on mootness.

these bases serve to impose liability for failure to make automatic rebates.  As the analysis below demonstrates, Defendants are correct.

1.  <u>Count One: Breach of Contract</u>.

In their Second Amended Complaint (Dkt. No. 36), Plaintiffs assert claims both for breach of the individual service agreements (which were also included in the Amended Complaint) and, as alleged third-party beneficiaries, for breach of the agreements between Defendants and the towns (which were added in the Second Amended Complaint). Neither theory will hold water.

Defendants offer the cable and Internet customer service agreements (Dkt. No. 9, Ex. 5 & 6) and point out that they expressly state that Defendants do not warrant continuous, uninterrupted service.  Plaintiffs object to the consideration of the customer agreements, in part because they have not been authenticated.  However, it is well recognized that at the motion to dismiss stage the court may consider documents central to the plaintiffs' claims.  <u>Blay v. Zipcar, Inc.</u>, 716 F. Supp. 2d 115, 118 (D. Mass. 2010) (considering extrinsic membership agreement).  Plaintiffs

cannot assert a claim for breach of contract and then object when the contract is placed on the record.

A cursory review of the relevant customer agreements immediately reveals that Defendants are correct that they do not guarantee uninterrupted service. (<u>See</u> Dkt. No. 9, Ex. 6 at 4 (stating that "Charter does not warrant uninterrupted use of service"); <u>Id.</u>, Ex. 5 at 5 (same).) Moreover, the agreements' <u>force majeure</u> clauses expressly provide that Defendants are not liable for service interruptions or outages cause by events outside Defendants' control. (<u>See</u> <u>id.</u>, Ex. 6 at 5 (stating that "Customer agrees that Charter will not be liable for any inconvenience, loss, liability or damage resulting from any failure or interruption of service, directly or indirectly caused by circumstances beyond its control"); <u>Id.</u>, Ex. 5 at 5 (same).) The unseasonable October snowstorm is manifestly covered by this clause.

The third-party beneficiary claims under the licensing agreements between Defendants and the towns have even less substance. To determine whether a plaintiff may maintain an action as a third-party beneficiary, the court must look to

the intent of the contracting parties.  <u>Markle v. HSBC
Mortg. Corp. (USA)</u>, 844 F. Supp. 2d 172, 181 (D. Mass. 2011)
(stating that "conferral of third-party beneficiary status
on a nonparty to a government contract must be consistent
with the terms of the contract and the policy underlying
it").  "Under Massachusetts law, a contract does not confer
third-party beneficiary status unless the 'language and
circumstances of the contract' show that the parties to the
contract 'clear[ly] and definite[ly]' intended the
beneficiary to benefit from the promised performance."
<u>Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.</u>, 455
Mass. 458, 466 (2009) (alterations in original).  Courts
presume that government contracts do not confer third-party
status absent a clear intent to the contrary.  <u>Markle</u>, 844
F. Supp. 2d at 181.

Plaintiffs' assertion that they are the intended third-
party beneficiaries to the licensing agreements floats on
nothing more than their own say-so.  The law does not permit
this.  Plaintiffs state in their Second Amended Complaint
that the parties to the licensing agreements "clearly and
definitely intended subscribers, including Plaintiffs and

the Class, to benefit" from the rebate provisions (Dkt. No. 36 at 5-6, ¶ 30), and that Plaintiffs are the "third party beneficiaries of Defendants' licenses with various cities and towns" (Id. at 9, ¶ 49).  There are no specific factual allegations set forth regarding the parties' intentions to confer a benefit on a third party.  See Cumis Ins. Soc'y, Inc., 455 Mass. at 468 (concluding that the plaintiffs were not intended third-party beneficiaries of the defendant's contract with another company and noting that plaintiffs merely asserted the conclusion that they were third-party beneficiaries and did not offer any supporting factual allegations in their complaint or in the attached agreement).  However, the terms of the licensing agreement between Defendants and the Town of East Longmeadow (attached to Plaintiffs' Second Amended Complaint) specify that it is between "the Issuing Authority" and Defendants, and subject to the terms and conditions "herein."  (Dkt. No. 36, Ex. 1 at 12.)  The agreement specifies that the Issuing Authority has the responsibility to monitor and enforce the terms of the license, and when it finds non-compliance, the Issuing Authority is to notify the licensee in writing.

No language in the licensing agreement signals any intent by the parties to confer third-party beneficiary

status on anyone, let alone the Plaintiffs.  Plaintiffs have
failed to state a claim for breach of contract based on
either the service contracts Plaintiffs have with Defendants
or the licensing agreements between Defendants and the towns
where Plaintiffs live.  Based on this, the court will
dismiss Count One.

    2.  <u>Count Two: Breach of the Implied Covenant of Good</u>
       <u>Faith and Fair Dealing</u>.

    Plaintiffs' claim for breach of the implied covenant of
good faith and fair dealing suffers similar, fatal flaws.
It is true that Massachusetts recognizes that such a
covenant exists in every contract under Massachusetts law.
<u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 411 Mass. 451, 471
& 473 (1991).  This covenant "provides that neither party
shall do anything that will have the effect of destroying or
injuring the right of the other party to receive the fruits
of the contract."  <u>Id.</u> at 471 (internal quotations omitted).
Though a party may breach the implied covenant of good faith
and fair dealing without breaching the terms of the
underlying contract, "the covenant may not be invoked to
create rights and duties not contemplated by the provisions

of the contract or the contractual relationship." <u>Speakman</u>
<u>v. Allmerica Fin. Life Ins.</u>, 367 F. Supp. 2d 122, 132 (D.
Mass. 2005).  As always, to survive a motion to dismiss,
Plaintiffs must provide more than "[t]hreadbare recitals of
the elements of a cause of action, supported by mere
conclusory statements." <u>Iqbal</u>, 556 U.S. at 678.

Plaintiffs rely on the same allegations for their
breach of the implied covenant claim as for their breach of
contract claim.  However, the implied covenant may not be
used to supply terms to the agreement that were not included
by the parties, "nor does it 'create rights and duties not
otherwise provided' for in the contract." <u>Chokel v. Genzyme</u>
<u>Corp.</u>, 449 Mass. 272, 276 (2007) (citations omitted); <u>see</u>
<u>also</u> <u>UNO Rests., Inc. v. Boston Kenmore Realty Corp.</u>, 441
Mass. 376, 385 (Mass. 2004).

To avoid these limitations on their claim for breach of
the implied covenant, Plaintiffs point to provisions of the
service agreements requiring notice of billing disputes as
being, themselves, breaches of the covenant of good faith
and fair dealing.  These provisions, Plaintiffs say, protect
Defendants from ever having to provide a rebate for a

service outage if a customer never requests one.  Apart from the wobbly logic of this claim, it simply cannot be said that provisions establishing methods for disputing a bill, or claiming a rebate, wherein the customer must notify Defendants of the billing dispute, amount to "fraud, deceit or misrepresentation . . . that would allow a court to find a breach of good faith."  Dunkin' Donuts Inc. v. Gav-Stra Donuts, Inc., 139 F. Supp. 2d 147, 156 (D. Mass. 2001).

Accordingly, Count Two will be dismissed for failure to state a claim.

   3. Counts Three and Four: Quasi-Contract Claims.

Counts Three and Four allege unjust enrichment and money had and received.  These are equitable causes of action "available to plaintiffs who lack adequate remedies at law."  Ruiz v. Bally Total Fitness Holding Corp., 447 F. Supp. 2d 23, 29 (D. Mass. 2006).  An action for unjust enrichment lies where "the defendant was enriched to the plaintiff's detriment without justification or an adequate legal remedy."  Id.  "An action for money had and received lies to recover money which should not in justice be retained by the defendant, and which in equity and good

conscience should be paid to the plaintiff." <u>Cobb v. Library Bureau</u>, 268 Mass. 311, 316 (1929).

Where there is an existing express contract, however, the law will not imply a contract. <u>Zarum v. Brass Mill Materials Corp.</u>, 334 Mass. 81, 85 (1956). Accordingly, there is no basis for recovery on equitable principles where the express contract covers the same subject matter. <u>Id.</u>; <u>see also</u> <u>Okmyansky v. Herbalife Int'l of Am., Inc.</u>, 415 F.3d 154, 162 (1st Cir. 2005) (stating that "the existence of a valid express contract between the parties ... bars the application of the equitable doctrines"). "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." <u>Platten v. HG Bermuda Exempted Ltd.</u>, 437 F.3d 118, 130 (1st Cir. 2006).

Quasi-contract claims are not back-up claims, available to Plaintiffs where their contract claims fail. Once a contract is established, "[t]here is no room for an implied contract." <u>Mass. Gen. Hosp. v. Fairbanks</u>, 129 Mass. 78, 81 (1880). Since the service agreements govern the relationships between Defendants and Plaintiffs, the quasi-contract claims, Counts Three and Four, must be dismissed.

4. <u>Count Five: Chapter 93A Claim</u>.

Chapter 93A of the General Laws of Massachusetts declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). Its purpose is to prompt proper disclosure of information and to create a "more equitable balance in the relationship of consumers to persons conducting business activities." <u>Commonwealth v. DeCotis</u>, 366 Mass. 234, 238 (1974). "[C]onduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice" under chapter 93A. <u>Anthony's Pier Four, Inc.</u>, 411 Mass. at 474.

However, "a mere breach of a legal obligation under commercial law, without more, does not amount to an unfair or deceptive act." <u>Framingham Auto Sales, Inc. v. Workers' Credit Union</u>, 41 Mass. App. Ct. 416, 418 (1996) (finding no chapter 93A violation where the facts did not show "pernicious purpose" in defendants' actions); <u>Monotype Imaging Inc. v. Deluxe Corp.</u>, 883 F. Supp. 2d 317, 323 (D. Mass. 2012) (stating that "mere breach of contract, without

-23-

more, does not constitute a violation of Chapter 93A").  At
the motion to dismiss stage, there must be sufficient
allegations in the complaint that, if proven, would form the
basis for a claim of unfair and deceptive trade practices.
See Speakman, 367 F. Supp. 2d at 140-1.

Plaintiffs here have alleged that Defendants committed
an unfair and deceptive practice under chapter 93A in
violating the requirements of chapter 166A, § 5, by failing
automatically to credit customers' accounts for the service
interruptions, or by failing to notify customers adequately
of their rights to a rebate or credit.  Chapter 166A,
entitled "Conditions imposed on licensee," contains section
5(l) which states that "[i]n the event its service to any
subscriber is interrupted for twenty-four or more
consecutive hours, it will grant such subscriber a pro rata
credit or rebate."  Mass. Gen. Laws ch. 166A, § 5(l).
Plaintiffs argue that the phrase "will grant" creates a
legal obligation on Defendants to credit customers' accounts
automatically in the event of a service outage.

The answer to this contention is straightforward: the
language of the statute does not require Defendants to

-24-

provide a rebate when none has been requested.  The language of the applicable provision speaks in terms of individual subscribers (if "any subscriber's" service is interrupted, a credit will be granted to "such subscriber"), not in terms of any blanket or automatic crediting to a body of subscribers.  The only fair implication of the language is that credits will be granted on an individual basis, upon request.

In interpreting the statute, the court must consider "the intent of the Legislature [as] ascertained from all its words construed by the ordinary and approved usage of the language." Roberts v. Enter. Rent-A-Car Co. of Boston, 438 Mass. 187, 191 (2002) (quoting Commonwealth v. Hinds, 437 Mass. 54, 63 (2002)).  The statute must be construed "as a whole to produce internal consistency," as well as with an eye towards the "practical effect of the plaintiffs' interpretation." Id. at 194.  To repeat, the only fair interpretation of the statute in light of these principles is that its provisions require only that the licensing agreements between the towns and Defendants include a provision for credits or rebates.  The language cannot be

-25-

twisted to demand that Defendants credit accounts en masse, automatically, without a customer request.[10]

Alternatively, Plaintiffs argue that section 5(l) of ch. 166A confers on Defendants a legal obligation to notify customers of their statutory right to a credit and that Defendants' notice was inadequate.  This argument falls as well.  First, the undisputed record clearly establishes that Defendants' customers <u>were</u> notified, at least in general, in their service agreements with Defendants of their right to claim a credit for outages.  (Aff. Cohan, Dkt. No. 41, Ex. 1 at 4-7 ¶¶ 14-23; Charter Cable Agreement, Dkt. No. 9, Ex. 5 at 2.)  Second, the statute contains no language requiring any specific form of notice.  There are numerous examples in

_____

[10] Defendants offer a plausible additional basis for this construction of the statute: technical infeasibility. Defendants state that "Charter does not possess the automated means to track when a customer loses and recovers service access, or measure the intervening time period." (Second Aff. Thomas P. Cohan, Dkt. No. 41, Ex. 1 at 3 ¶ 9.)  It is neither fair nor reasonable for a court to construe a statute in such a way that it requires an entity to do the impossible. Plaintiffs have not directly countered Defendants' argument of technical infeasibility. Because this argument relies on extensive material outside the four corners of the complaint, however, and may take the court outside what may properly be considered in weighing a motion to dismiss, the court will not rely on this argument.

the General Law of Massachusetts where the legislature has written into a law notice requirements with specific details.  See generally Mass. Gen. Laws ch. 106, § 7-210 (requiring notice to all persons claiming an interest in the goods subject to sale and specifying that the notice include the amount due, the nature of the proposed sale, and the time and place); ch. 90, § 32E ½ (B)(2) (requiring a notice "in no smaller print than ten point font" regarding the option consumers have to decline added collision coverage when renting a car); ch. 93, § 68D(a) (requiring a notice to the buyer by a credit services organization of the buyer's right to cancel the contract within three days).  It would be improper to read into chapter 166, § 5 particular notice provisions that the legislature has not chosen to identify. Rosing v. Teachers' Ret. Sys., 458 Mass. 283, 292 (2010) (stating that the court will not add language to a statute that the legislature did not include, especially where the language is found in other parts of the General Laws).

In sum, chapter 166A, section 5(1), does not impose on Defendants the obligation to provide a credit or rebate automatically to customers in the event of a service outage

lasting twenty-four hours or more.  Moreover, section 5(l) does not impose on Defendants any particular notice obligation.  Accordingly, Plaintiffs have not made out a claim for a chapter 93A violation based on a statutory violation.

Plaintiffs have alleged no other facts showing that Defendants' actions fall within some concept of unfair, immoral, unethical, or unscrupulous behavior.  <u>Boyle v. Int'l Truck & Engine Corp.</u>, 369 F.3d 9, 15 (1st Cir. 2004). Accordingly, Plaintiffs have failed to state a claim for violation of chapter 93A.  Count Five must be dismissed.[11]

IV. <u>CONCLUSION</u>

For the foregoing reasons, all claims offered by Plaintiffs Cooper, Romito, and Baker must be dismissed for lack of subject matter jurisdiction.  As to Plaintiff Thompson -- and, in the alternative, as to the other three Plaintiffs -- all claims must be dismissed for failure to state a claim.

---

[11]   Because the court has dismissed all Plaintiffs' substantive claims, they are not entitled to a declaratory judgement.  Thus, count six for declaratory judgment will also be dismissed.

For the reasons stated above, Defendants' Motion to Dismiss (Dkt. No. 8) is hereby ALLOWED.  This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge